Good afternoon. Good afternoon. This is 4-14-0294. Clifford Cozad v. CHW Displays, Inc. The appellant, Jude Redwood, for the alchemy, John Stevens. Ms. Redwood, are you ready to proceed? Yes, Your Honor. May it please the court and counsel, My client was deprived of his money compensation. I was deprived of my contingent fee. When the case got hard, I persevered. I didn't bow out, leave my client to falter alone. I'm here because I want the money from CHW's insurance company. We proved injury. All of the ear and hearing specialists agreed that Mr. Cozad had tinnitus and sensorineural hearing loss. Defendant's expert, Dr. Pange, testified there was no record of tinnitus before July 3rd, 2008. We could have proved negligence under the RACIPSA instruction. This court has the power and the duty to order monetary sanctions for defense violations of the Discovery Rules, the Petrillo Doctrine, and the Mental Health Act. The violations of the Mental Health Act and the Petrillo Doctrine resulted in an egregious violation of the Illinois Supreme Court rules. Monetary sanctions are available to me under Rule 219C and Rule 137, as requested below. In this appeal, the plaintiff is requesting to reverse the jury verdict, to strike the defendant's answer and enter a default judgment, to award attorney fees as a sanction for discovery violations, send the case back for damages to be determined without the testimony of Dr. Cohn, or in the alternative, award damages requested below. The trial errors include the testimony by Mr. C.H. Whitting about product malfunction, where an objection was sustained, but the answer was not stricken, nor was the jury admonished not to consider that testimony. Second, the argument by the defense, allowed by the trial court, that the shells did not perform normally, an affirmative defense that was not pled, and a Rule 213 discovery violation because it was never disclosed. The refusal to instruct the jury on the res ipsa loquitur as an alternative to general negligence, and the court's refusal to bar the testimony of Dr. Norman Cohn as a sanction for a violation of the Petrillo Doctrine, and under Rule 219C, and violations of the Mental Health Act. The court denied plaintiff's motion for a res ipsa loquitur jury instruction. Under res ipsa, in the cases under the Supreme Court, the presumption doesn't vanish or disappear if there's contrary evidence that appears from the defense, but it remains to be considered with all of the other evidence, and has to be weighed by the jury against the direct evidence offered by the party charged. Now, the defense has argued that the court made a ruling as a matter of law, and the court did make a ruling on res ipsa, but the only thing the court said is, there's facts in dispute, so I'm not going to give a res ipsa instruction. Normally, IPI Civil 2202 allows the jury to prove the three different points. First, that the plaintiff was injured. Second, that the injury was received from, in this case, a firework that exploded within the crowd, which was set off by CHW, which was under the defendant's control and management. And third, that the injury wouldn't have occurred in the normal course of events if CHW had used ordinary care while setting off the fireworks. So all three of those would have been submitted to the jury. The fact that there was contrary evidence from the defense does not mean that the jury can't be instructed under res ipsa. In fact, res ipsa is an alternative negligence instruction, and the Illinois Supreme Court is very clear on that. Now, the cases cited by the defense under res ipsa have to be, number one, restricted to their facts, where the plaintiff put up no evidence whatsoever that there was any kind of negligence. And the other point is, both of these two cases from the first district just go entirely against the Illinois Supreme Court. The Supreme Court says that the jury can be instructed on both res ipsa and general negligence, while these cases at the first district found you couldn't use res ipsa as an alternative. The threshold for giving up a jury instruction isn't high. Litigants have a right to have a jury instructed on each theory that's supported by the evidence. So the question is, was our theory supported by the evidence? And I submit to you that it was. One of the defense's big arguments was that the timing was off, because the plaintiff's witnesses testified that the show had been going on for 10 or 15 or 20 minutes, or maybe it was in the middle of the show. However, Mr. Budwitting testified in Volume 4, page 779, that the show started at 9 p.m. And the six-inch red, white, and blue shells that were determined to be the cause of a low burst within the crowd were fired maybe five to seven minutes later, after different things had taken place. Michael Jones, the EMT who treated the plaintiff right there at the park before he went to the hospital, wrote down that 9-11 is the time that he first took Mr. Colzad's blood pressure. That's at Volume 2, page 338. It's also found in Defendant's Exhibit No. 2. So the time there, under these two factors that show what time things happened and not somebody's guess or surmise about what time it was, show that indeed the injury occurred from that first volley of fireworks. Budwitting testified about the program starting. There was a flag ceremony. There was a national commander. There were five units of veterans there. This included marching with the flag, the commander speaking so everybody could see him. There was a national anthem played with a singer. Then there was a volley of small shells. Then there was an announcement to a deceased member of the group. And only after all of these things happened did the six-inch shells that caused the low burst get fired. So all of those events happening after the 9 o'clock start show that it's reasonable to believe, and the jury could have believed, that the plaintiff's injuries and when the fireworks came down and exploded next to him causing the bright flash was from CHW. Deputy John Russell, who is not a party and was not an interested person, was a 22-year veteran of the Piatt County Sheriff's Department. He was on foot patrol right in the area of the porta-potties. He heard a loud explosion that he testified was as loud as those fireworks that go up off in the sky, except louder because it was so low. He testified there were people running, 30 to 40 people were running from the area. A 20-foot-wide cloud of smoke was rolling down from about 8 foot up in the sky. People told him that their lights buckled from the explosion, and he testified that the explosion could not have been from consumer fireworks. It was Sergeant Russell's opinion from his experience that the fireworks came from CHW displays. In addition, he reported that 29 people were treated at the scene and 3 people were sent to the hospital. One of those people that was sent to the hospital was Mr. Kozad, the plaintiff in this case. Deputy Russell came to the porta-potties within seconds of hearing the explosion. Jared Kozad testified he was coming up from the river and the fireworks had just started. It was about 10 to 15 minutes into the show, which is consistent with CHW testimony about all of the things that happened before these 6-inch shells went off. He heard the explosion, he felt the ground shake a little bit, he smelled gunpowder, and he saw a bright light flash. He came upon the plaintiff who was curled up in a fetal position holding his ears. Craig Whitting testified that after the one blue shell landed in the crowd, more of these 6-inch shells were set off, were lit, and sent off before the show was stopped. Michael Jones, the EMT, testified that the plaintiff complained of ringing in his right ear, headache and dizziness after a misfired firework exploded in the crowd near the plaintiff. He testified there had been a misfire of fireworks that exploded into the crowd and they had a number of individuals being treated for this. He also testified that exposure to a loud noise can cause tinnitus. And Rosie Cosette, the plaintiff's wife, testified that she got up to the plaintiff maybe 10 to 15 minutes after the show started. All of those timings are consistent. The injuries are consistent with a firework exploding. The res ipsa loquitur jury instruction should have been given because there was enough evidence for the jury to find negligence. And the important thing is that if the jury did decide that this was a CHW displays firework that exploded, the fireworks, the setting off of these fireworks, was completely in the control of CHW, the defendant. And the plaintiff had no opportunity to have any witnesses who were back there because it was all, of course, kept off by the caution tape. People couldn't go back there and inspect the shooting area. That would be dangerous. So it was all under the control of CHW. Under those facts, there should have been an instruction to the jury under res ipsa loquitur. Absent that instruction, the plaintiff was left with the only option of having to prove the specific acts that caused the negligence. This he could not do. As I said, he wasn't back there. And nobody from CHW was willing to come forward and testify, yes, we had some negligence. But the DNR letter that Mr. Riddick testified he received and did not contest supported that there was negligence among this group. And all of the group who did the firing off of the fireworks, if they wanted to keep their license, had to go back for more training because they violated the statute and they did negligently allow fireworks to go into the crowd. Under the Petrillo Doctrine, this court in Fakes v. Eloy recognized the Petrillo Doctrine applies to cases where a physician divulges information to a third party that was disclosed to that physician in confidence. Now, here, the third person is Dr. Norman Cone, the defendant's expert, who was retained specifically to destroy the plaintiff, destroy the plaintiff's credibility, and make him seem like he was totally insane. In order to do that, Attorney Brooke took these video depositions, evidence depositions, that were conducted ex parte with no one there on behalf of the plaintiff to challenge foundation, to make objections, to even question these doctors, I mean, I'm sorry, the one doctor and then the two mental health workers about what they observed, how much time they had to talk with the plaintiff, what was going on. These video evidence depositions were turned over to Dr. Cone, who viewed them and used them in formulating his opinions. Besides the video depositions, Attorney Brooke talked with each of these treating professionals off the record. At the beginning of each deposition, he says, we've been talking. We don't know what they've been talking about. There's no way to know what they were talking about. But that's why the contact is prohibited by Petrillo. We don't have to go into what it was that disclosed, how it harmed the plaintiff, anything like that, because it's the contact itself with the treating professionals, and especially these mental health treating professionals, that violates the Petrillo Doctrine. Under the public policy prong of the Petrillo Doctrine, these can't be used. And Dr. Cone has to be excluded because his opinions were based on those DVDs as well as other records. The defense was required under the Illinois Mental Health Act to submit those DVDs to the court for in-camera inspection before re-disclosing them to their expert witness. The expert witness's entire job was to destroy the plaintiff's claim of damages of proximate cause, well, to destroy the plaintiff basically. The defendant's attorney completely ignored the Illinois Mental Health Act requirements in giving those DVDs to Dr. Cone before submitting them to the court for in-camera hearing. In fact, I had no idea those had gone to Dr. Cone without being submitted to the court first. I learned that prior to trial. The ex parte communications between defense counsel and plaintiffs treating professionals is prohibited. It's a violation of public policy. The public policy violation occurs regardless of what information is actually revealed. The public policy concerns are based on the sanctity of the physician-patient privilege. Relief under the Petrollo Doctrine that we're asking for is to reverse the jury verdict, to strike the defendant's answer, and for a default judgment in favor of plaintiff in remand for a trial on damages. Our third claim is discovery violations. Product malfunction is something that was brought up during trial. Now, early on in written discovery, under 213, the request was sent in interrogatories to explain how this happened. Instead of saying that it might have happened by product failure, the defense did nothing of that nature. They said, can't tell you that. We'll go to deposition. The defense never pled an affirmative defense of product failure or product malfunction, which is required under the Code of Civil Procedure. If you have an affirmative defense, you have to plead it so you let the other side know what they're up against. At that point, I had no idea that they were pleading product failure. No one ever checked the product. No one ever sued somebody else. And, in fact, the product was sent off and destroyed. Now, if they had alerted the plaintiffs that there was some issue as to product failure, there would be a spoliation of evidence claim. But there wasn't, because that was never pled. In discovery, it was never disclosed. In fact, at depositions, the deposition of Mr. C.H. Budwig, he testified that he didn't know anything about product failure. And Mr. Completely unresponsive answer to my question, he said that it could have been because of product failure. I immediately objected to his answer. I moved to strike. And the court did grant the objection because it was unresponsive. However, the court didn't strike the answer and didn't admonish the jury to ignore the answer. The jury then was allowed to use that answer. And, in closing argument, another blatant violation of Rule 213, defense counsel argued that it could have been a product malfunction. Nobody told him about the product malfunction. So he snuck this in, too. I objected there. And that was denied. The judge said there was facts in dispute. The judge failed to even touch the issue of the 213 violations, which is central to the argument because the discovery rules have to be obeyed. If we don't obey the discovery rules, then it's called trial by ambush. And as this court has said, when plaintiff's counsel gets up to cross-examine the defendant, she has a right to know what his answer will be because it's been disclosed in discovery. The sneaking in of the argument and testimony about product malfunction were blatant violations of Supreme Court Rule 213 in the Illinois Code of Civil Procedure. That was never disclosed, and it was denied at depositions. For all of the reasons stated in our brief and the requests that are requested, plaintiff submits his brief, and I thank you. Thank you, counsel. Mr. Stephens? Thank you, Your Honor. May it please the court. Counsel, my name is John Stephens, and I represent the appellant in this matter, the defendant at trial, C.H.W. Displays. The defendant is asking this court to affirm the decision of the trial court judge and to defer to the verdict returned by the jury. The appellant plaintiff has identified three key issues on appeal, which she's previously discussed, but those issues are the failure to instruct the jury on res ipsa loquitur, the admission of testimony of Dr. Norman Cohn in an alleged patrol doctrine violation without appropriate sanctions, and the introduction of an unplead affirmative defense. On the issue of res ipsa loquitur, as appellant did point out, the threshold for permitting an instruction is low. However, reversing a judgment on the basis of an instruction, the threshold is high. It is reviewed on an abuse of discretion and serious prejudice to the party's right to a fair trial. In this case, the judge looked at the jury instructions. Multiple jury instructions were offered by both sides. Some were accepted. Some were denied. One of the issues in this case throughout was whether or not plaintiff could prove the approximate causation of his injuries from the fireworks display. There's no question that fireworks product from CHW displays broke in the crowd in Lodge Park on July 3rd, 2008. Numerous people were affected by this. Ambulances were called. That is not in dispute. What has been in dispute from the beginning and throughout is that whether or not Clifford Kozad was injured by that incident. The res ipsa loquitur doctrine is only applicable when there is a single inference of negligence that can be drawn from the facts. While appellant disputes the cases that we have provided regarding res ipsa loquitur, I would draw the court's attention to a case, an Illinois Supreme Court case, that the appellant does rely on, Heastie v. Roberts. In Heastie, you have a severely intoxicated plaintiff who goes to a hospital, was strapped to a gurney for his own protection, not searched, and was placed alone in a separate room. Subsequently to that, a few hours later, the plaintiff was discovered to be on fire. Now, as the court stated in that case, human bodies do not spontaneously combust. Either somehow that fire was set, and whether or not the plaintiff could have done that didn't matter because he'd been restrained to a bed and had not been searched for contraband as he was supposed to have been. This is not similar to what happened in this case. In this case, Mr. Kozad, suffering from diabetes, from hypertension, from peripheral neuropathy, claims that he was struck by a fireworks device broke one foot away from his head, causing him to have these injuries along with some ringing in his ears and tinnitus. However, as was shown at trial, and as was argued at trial, there were consumer fireworks being shot at the time. Mr. Kozad does not recall where he was when the incident happened. I discussed this in our brief, and I would draw your attention back to that, but at various times in Mr. Kozad's testimony, he's at the front of the truck, he's at the back of the truck, he's overlooking the antique cars. The incident happened immediately. It happened midway through the show. He doesn't know. He didn't remember. He's also the only witness. Is it a theory that somebody else shot a firework that affected him? Our theory, Your Honor, is that it's possible. There were consumer fireworks being shot at the time in the park, as well as the fact that he may not have been injured by a firework at all. They just drove up and laid down on the ground, and he always had to go into the hospital for nothing? No, Your Honor. At the time, and as discussed by EMT Jones, his blood pressure was in near-stroke levels. His blood sugar was through the roof. Mr. Kozad was severely, severely ill and needed emergency treatment, but he did not need emergency treatment for a blast injury. There was no documentation by EMT Jones of burning or scorching or any sort of injury that might come from a blast. Mr. Kozad testified that the incident had caused him to vomit and that he laid in the vomit for some time, but there was no record of that in the EMT results. Mr. Kozad was very, very sick on the night of July 3rd, but he was very, very sick because he wasn't treating his diabetes and he wasn't taking care of himself. The diabetes, the hypertension, these were not caused by a fireworks incident. Whether it was shot by a defendant, as argued, or by someone else, those are simply not injuries that come from a blast. So... What about the tinnitus? The tinnitus can be caused, and there was testimony at trial from Dr. Panji, that tinnitus can be caused from any number of injuries, including a blast injury. It is possible that a blast injury could cause tinnitus. However, it can also... The medical records prior to this either indicated he had tinnitus. That is true. There is nothing, Your Honor, in the medical records prior to that time that he had tinnitus. However, there is nothing in the medical records prior to that time that says he didn't. And what is in the medical records prior to that time is an incident of pancreatitis from 2004 due to alcoholism. Pancreatitis, diabetes, alcoholism, these are all known factors of tinnitus, or they are known to have tinnitus as a part of them. Additionally, Mr. Kozad worked for many, many years as a garbage truck worker. His job was to ride on a garbage truck, or to... At one time, I believe he said he was using a chainsaw to cut down trees. All of these can contribute to tinnitus or hearing loss. When Mr. Kozad had his audiograms done, the first audiogram, which was done in St. Louis, and the third audiogram, which was done by Denise Sander, showed a similar demarcation of gradual hearing loss in the upper ranges. The only audiogram that showed a marked, what's called a V-notch, which shows an explosive or a percussive injury, was the one done by Mr. Bierbaum, who was retained by plaintiffs to evaluate his hearing. When Dr. Panji looked at these three audiograms together, his conclusion was that there was no single blast injury. While it could have caused tinnitus, there was no evidence over these three audiograms that there was a blast injury. Rather, that there was a general degradation coming with age, with diabetes, with a history of dealing with loud machinery. So, res ipsa loquitur was not appropriate because there was no single inference that could be drawn. Yes, if the firework that caused the injury had been from CHW's displays, it may have been appropriate, but there was no evidence of that. There were no eyewitnesses to this injury. Deputy Russell, who was called, testified that he was nearby, but he did not see it. Jared Kozad, the nephew, was down the hill, coming up the hill at the time. He remembers seeing a flash of light, but he didn't see the plaintiff at that. No other witness was called to testify regarding this. In fact, plaintiff at trial relied on the report, the Illinois Department of Natural Resources report prepared by Jeffrey Steiner, indicating that there may have been negligence in the display. The plaintiff did not call Mr. Steiner. Plaintiff didn't call anyone from the Illinois Department of Natural Resources. Plaintiff had the burden to prove negligence in this case, and plaintiff chose who to present and who not to present, and failed to carry that burden. One of the other key issues regarding this case is the depositions in Mississippi and the testimony of Dr. Cone. Dr. Cone was not a fact witness. Dr. Cone was called to discuss damages. Plaintiff had alleged a large number of damages stemming from this incident that at one time included a stroke that he had subsequently. Now, plaintiff's own expert admitted that the stroke was not reasonably related to the fireworks incident, but plaintiff's expert, Dr. Beatty, who also was not a treating physician and was not a fact witness, testified that plaintiff had a number of injuries. He had an eggshell-like condition. He had post-traumatic stress disorder. He had a series of mental health issues stemming from this incident. Whether or not Dr. Cone or Dr. Beatty's testimony influenced the jury is, in a sense, less important than the fact witnesses because they were talking about damages. This was not a bifurcated trial. The jury was presented with all of the evidence and had to decide whether or not negligence had occurred and if it found for the plaintiff what that amount of damages might be. The jury didn't get to the second step, so the testimony of Dr. Cone and Dr. Beatty, while it may be insightful into the plaintiff's character and behavior, doesn't address the basic issue about what happened in this case. Further, the court, looking at this situation, looking at what had happened regarding the Mississippi depositions, chose to enter a sanction. At the time the court entered the sanction, it said, this is not something I take lightly. But it barred the presentation of two evidence depositions, as well as any reference thereto. This decision by the court is one that is reviewed on appeal at the sound discretion of the court. The court looked at the issues, looked at what had happened. In an attempt to present a fair trial to both sides but deal with this discovery issue, the court decided to bar the evidence depositions, to bar reference thereto. The plaintiff also argues that there was an unplanned affirmative defense that was snuck in at trial and that this sandbagged the plaintiff. This is simply not the case. The defense argued throughout trial and throughout the entire litigation that the plaintiff wasn't carrying his burden of proof, that the plaintiff couldn't tie this alleged fireworks incident to the injuries that he had. This testimony that supposedly Mr. Wittig snuck in was in response to questions from plaintiff's counsel. Plaintiff's counsel had called Mr. Wittig in her case in chief. She questioned him at length about a number of fireworks items, how they behave, how they act, why they do what they do, why they don't do what they do. While the answer in review and pulled out by itself may have appeared unresponsive to the question, if you look at it in the larger context of this testimony, you can see that he was simply trying to the best of his ability to answer the questions that were being posed to him. Similarly, in closing argument, the remarks that plaintiff failed to carry his burden or failed to show negligence were not the affirmative defense of product liability. It was another means of showing where plaintiff had failed to prove his case. This is not trial by ambush. This is not sandbagging. This is what every defense counsel does in every civil case and in criminal cases. It's pointing out the weaknesses in the plaintiff's case, saying to the jury, this is what could have happened. That is what could have happened. Look at the injuries. Look at the effects. Decide for yourselves whether or not they tie together. Similarly to the other violations, this is reviewed on the sound discretion of the court. The court looked at this. The court made a determination that there was nothing requiring a new trial or an additional sanction. The court did not abuse that discretion, we feel, and that should be upheld. Lastly, and as argued throughout our brief and my time here with you, this is a case regarding the discretion of the trial court to make decisions and the verdict returned by a jury after a week-long trial with over 14 witnesses. Both the court's decisions and the jury verdict should be given deference by this court. The plaintiff received a fair trial. The judge made any number of rulings going in different directions. Credibility decisions, decisions about whether or not the alleged incident could have caused the alleged injuries, these are the decisions we typically give to juries and that we expect juries to be able to weigh and determine. The verdict was not against the manifest weight of the evidence. The verdict was within the disputes and evidence issues that were presented to the jury, and the jury evaluated all of this material that was provided and found simply for the defendant. It did not find for the plaintiff an issue with a low number of damages. That would raise an issue of whether or not there was a damages dispute. They found that the plaintiff failed to carry his burden on negligence. The judge, in his discretion, looked at the evidence issues, the discovery issues, and the other related issues and made appropriate decisions and sanctions along the way. There's no evidence that the judge abused his discretion.  And for those reasons, unless your honors have any additional questions, I would ask that the jury verdict be upheld. We did not give the jury any ability to find for the plaintiff because the jury didn't get an instruction under Res Ex Illoquitur. Everything that CHW did in setting off these player works, these six-inch big shells that went into the crowd, that they admitted some went into the crowd, were behind the caution tape. And the plaintiff lawfully, and he was where he was supposed to be, there's no question, he was by the porta potties. There is prejudice to the plaintiff by denial of the Res Ipsa jury instruction. The Heastie Court said, nor must the plaintiff eliminate all causes of his injuries other than the negligence of one or more of the defendants. That's what Heastie said. That's what the Supreme Court said. Only in these two First District cases, and I've looked at these Res Ipsa cases, I've got a folder, one like that. Only in those two First District cases does the court say that you have to have only that one inference. In fact, in 1965 in Metz v. Illinois Central Electric, the Supreme Court expressly overruled a case called Ballenbeck v. Blumenthal from, I believe, 1931 that said you have to have only this one inference. It's not true. Those cases have to be on their facts only. The plaintiff never alleged that he got diabetes or high blood pressure as a result of the fireworks. I don't even know where that came from. He had diabetes. He had high blood pressure. We didn't dispute that. We said they were under control. EMT Jones wrote down that the plaintiff's main complaint was a ringing in his right ear. That's where the plaintiff testified that this thing came down, and he saw it. Was he confused at trial? Oh, yeah. He's suffering terribly. He was a terrible witness. But his deposition wasn't terrible, and the other witnesses, I think I could put this trial on without him, as a matter of fact. He was a terrible witness. He's suffering very terribly, and he needs help. I didn't rely on the IDNR report. I used the letter. The letter named all of these people who were shooting off the fireworks and CHW displays and stated that the department found that they had violated the Illinois Explosives Act and they had negligently set off fireworks that exploded into the crowd. You have a right to dispute that if you want to. I entered that letter to ask Mr. Wittig about it. Did you dispute it? No, I didn't dispute it. You paid the fine? Yes, I paid the fine. Dr. Cohn didn't just testify about damages. He testified about proximate cause and whether the plaintiff sustained any damage from the firework, both of those things, because he said that everything that happened to the plaintiff there wasn't the cause of anything that exploded. He was already, as counsel said, a very sick man. So he didn't testify just as to damages. The court's sanction was only pursuant to Rule 206. That's why he kept out the depositions from Mississippi, but he refused to sanction the defense under the patrol doctrine. Dr. Cohn, through his testimony, referenced the Mississippi depositions because even though he said he wasn't going to, he saw them. He saw that Dr. McGinnis snickering about the plaintiff on the videos. You don't get to see the videos because the court wouldn't put them into the record. But that doctor who saw the plaintiff for less than three hours total was a pill pusher. And he just prescribed pills, and he snickered in the deposition about my client and about his mental health. And that's what Dr. Cohn saw. And I would submit to you that every defense counsel does not argue an unpledged affirmative defense. That happened in this case. That was wrong. We need to go back. Thank you. Thank you, counsel. We'll take this matter under advisement in recess.